# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-AN-00563-SCT

*IN THE MATTER OF THE ENLARGEMENT
AND EXTENSION OF THE MUNICIPAL
BOUNDARIES OF THE CITY OF
SOUTHAVEN, MISSISSIPPI:
CITY OF HORN LAKE*

*v.*

*CITY OF SOUTHAVEN, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/27/2002 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | BILLY C. CAMPBELL, JR. |
| | WILLIAM AUSTIN BASKIN |
| | JERRY R. WALLACE |
| ATTORNEYS FOR APPELLEE: | JERRY L. MILLS |
| | RONALD LOUIS TAYLOR |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 11/20/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, P.J., WALLER AND CARLSON, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     The City of Horn Lake, Mississippi, appeals from the Chancery Court of DeSoto County's approval of the annexation of 310.24 acres in DeSoto County (the "Proposed Annexation Area" or "PPA") by the City of Southaven, Mississippi.  The first two issues raised by Horn Lake pertain to an agreement entered into by the city administrations of Horn Lake and Southaven wherein Southaven agreed not to

object to an annexation of the PAA by Horn Lake and declared the property to be in Horn Lake's natural path of growth. Horn Lake argues that, based on this agreement, equitable estoppel and judicial estoppel should bar Southaven's annexation of the PAA. Horn Lake also argues that the chancellor's decision to allow Southaven's annexation of the PAA was manifestly wrong and was not supported by substantial and credible evidence. Finding no merit in these issues, we affirm the chancellor's decision to allow Southaven to annex the PAA.

## FACTS

¶2. In the 1990s, Horn Lake, which lies to the west of I-55, and Southaven, which lies to the east of I-55, both experienced massive growth due to their proximity to the Memphis, Tennessee, metropolitan area. Horn Lake and Southaven each annexed large tracts of land to accommodate the residential and commercial growth. During this growth period, Southaven acquired, inter alia, some land which lay west of I-55, but east of United States Highway 51.[1]

¶3. In 1997, Southaven filed proceedings to annex certain land west of Highway 51. After five days of trial in early 1998, Southaven and Horn Lake entered into an agreement whereby Southaven agreed not to annex the land west of Highway 51 and would "not object to any future annexation filed by the City of Horn Lake to annex any lands . . . West of the West right of way of Interstate 55." Southaven also stipulated that "the aforesaid tracts lie in the path of growth of the City of Horn Lake and should be considered as a part of Horn Lake's annexation reserve area."

¶4. After the agreement was made, Horn Lake annexed land lying to the south and west of Horn Lake, but did not seek annexation of the PAA in question.

---

[1]Highway 51 parallels and lies to the west of I-55.

¶5.     Southaven filed annexation proceedings in 2001 to acquire the 310.24 acres which are the subject of this appeal.  The 310.24 acres lies to the south and west of Southaven and are bisected by Highway 51.  A little over half of the entire tract already lay within Southaven's city limits.  The PAA is owned in its entirety by the College Road Land Company and is described as "completely unimproved land consisting of uninhabited pasture land with scattered trees and rolling hills."  The owners requested Southaven to annex the property, because they wanted to develop the property as a single unit under the regulations of a single jurisdiction.

¶6.     Horn Lake filed a motion to dismiss based on Southaven's stipulation that land west of the I-55 west right-of-way was in Horn Lake's path of growth, and its agreement that it would not object to Horn Lake's future annexation of land lying west of Highway 51.  Southaven responded, stating that it was not bound by the 1998 agreement because it had been entered into by a previous administration which ended its term of office on June 30, 2001.  Horn Lake countered that the "previous" administration was comprised of exactly the same people as the "current" administration, and that equity demanded that Southaven abide by the 1998 agreement.

¶7.     In denying Horn Lake's motion to dismiss, the chancellor noted he could not find, and Horn Lake had not cited, any authority which states that if the same city administration is reelected for a successive term, the principle that one city administration cannot bind a succeeding administration does not apply.  The chancellor went on to find that Southaven's annexation of the PAA was reasonable under the totality of the circumstances and in the best interest of the owners.  From these orders, Horn Lake appeals.

## DISCUSSION

## STANDARD OF REVIEW

¶8.     For questions of law, we employ a de novo standard of review and will only reverse for an erroneous interpretation or application of the law. ***T.T.W. v. C.C.***, 839 So. 2d 501, 503-04 (Miss. 2003).

¶9.     Our standard of review for annexation is very limited. We may only reverse the chancery court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence. ***Enlargement and Extension of Mun. Boundaries of City of Madison v. City of Madison***, 650 So. 2d 490, 494 (Miss. 1995). We also stated "[w]here there is conflicting, credible evidence, we defer to the findings below." ***Bassett v. Town of Taylorsville***, 542 So. 2d 918, 921 (Miss.1989). "Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence." ***Bassett***, 542 So. 2d at 921. "We only reverse where the chancery court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made." ***Id.***

## I.      WHETHER EQUITABLE ESTOPPEL SHOULD BAR SOUTHAVEN'S ANNEXATION OF THE PAA.

¶10.    Equitable estoppel is a doctrine "by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right he otherwise would have." BLACK' S LAW DICTIONARY 373 (6th ed. abr.1991). A party asserting equitable estoppel must prove a (1) belief and reliance on some representation; (2) change of position as a result of the representation; and (3) detriment or prejudice caused by the change of position. ***Mound Bayou School Dist. v. Cleveland School Dist.***, 817 So. 2d 578, 583 (Miss. 2002); ***Covington County v. Page***, 456 So. 2d 739, 741 (Miss. 1984).

### A.  Whether Annexation is a Discretionary Act or a Ministerial Act

4

¶11.     Southaven contends that neither equitable nor judicial estoppel apply because, where the act at issue is a discretionary one instead of a ministerial one, one city administration cannot bind succeeding city administrations. *Biloxi Firefighters Assoc. v. City of Biloxi*, 810 So. 2d 589, 593 (Miss. 2002) (citing *American Oil Co. v. Marion Co.*, 187 Miss. 148, 192 So. 296, 299 (1939); *Tullos v. Town of Magee*, 181 Miss. 288, 179 So. 557, 558 (1938); *Edwards Hotel & City R. Co. v. City of Jackson*, 96 Miss. 547, 51 So. 802, 805 (1910)).[2]

¶12.     We have never determined whether the power to annex is discretionary or ministerial, but the statute conferring the power to annex uses permissive language, not mandatory:  "When any municipality *shall desire* to enlarge or contract the boundaries thereof by adding thereto adjacent unincorporated territory . . . .," and, "In the event the municipality *desires* to enlarge such boundaries . . . ."  Miss. Code Ann. § 21-1-7 (Rev. 2001) (emphasis added).  The use of this permissive language leads to the conclusion that the power to annex is a discretionary act, not a mandatory act.  Therefore, *Biloxi Firefighters* and the other cases would apply to an agreement whereby a city administration agrees not to annex a certain parcel of land, and that agreement would not be binding on successive administrations.

¶13.     On February 8, 2000, the landowners wrote a letter to the DeSoto County Planning Commissioner in which they stated that they "intend[ed] to honor the current non-aggression agreement between

---

[2] *See also* 56 Am. Jur. 2d Municipal Corporations:

> Where the contract involved relates to governmental or legislative functions of the council, or involves a matter of discretion to be exercised by the council, unless the statute conferring power to contract clearly authorizes the council to make a contract extending beyond its own terms, no power of the council so to do exists, the council presently holding such powers is vested with no discretion to circumscribe or limit or diminish their efficiency, but must transmit them unimpaired to their successors. . . .

Southaven and Horn Lake signed in 1998." We find that this letter is without significance because the "non-aggression agreement" was not valid after Southaven's city elections in 2001.

## B. Limits on Equitable Estoppel

¶14.     Horn Lake states that equitable estoppel is not limited by the precedent set out above. Yet at least one state has found that equitable estoppel does not apply where a governmental entity claims sovereign immunity, *see, e.g.,* **Indiana Dep't of Envtl. Mgm't v. Conard**, 614 N.E.2d 916, 921 (Ind. 1993), except where there is "clear evidence that [the government's] agents made representations upon which the party asserting estoppel relied." **West Publ'g Co. v. Indiana Dep't of Revenue,** 524 N.E.2d 1329, 1333 (Ind. Tax Ct.1988). However, the party claiming equitable estoppel against a governmental entity "must show that estoppel is not inconsistent with the public interest, and this interest must be weighed and balanced against the equities of the circumstances." **Muncie Indus. Revolving Loan Fund Bd. v. Indiana Const. Corp.**, 583 N.E.2d 769 (Ind. Ct. App. 1991).

¶15.     The public interest for Southaven to annex the PAA is without question. Southaven a growing by leaps and bounds, and it needs more land in an area where land is at a premium. The cities of Southaven, Horn Lake and Olive Branch are all jockeying for more land where undeveloped land is increasingly scarce. Therefore, Horn Lake cannot show that estoppel "is not inconsistent with the public interest."

¶16.     Horn Lake claims that it detrimentally relied upon the agreement because, believing that the PAA would eventually be annexed, it intentionally chose not to seek to annex the PAA when it had the opportunity to do so. We find this contention to be without merit because Horn Lake, which seeks equity, did not take affirmative steps to protect its rights under the Agreement. Horn Lake had a window of opportunity to annex the PAA and it did not act. Weighing the equities, we find that Horn Lake was "harmed" not by Southaven, but by its own negligence. This claim is without merit.

6

## II.     WHETHER JUDICIAL ESTOPPEL SHOULD BAR SOUTHAVEN'S ANNEXATION OF THE PAA.

¶17.     Judicial estoppel is a doctrine of law applied by a trial court to a situation where a party asserts one position in a prior action or pleading but then seeks to take a contrary position to the detriment of the party opposite. *Mississippi Power & Light Co. v. Cook*, 832 So. 2d 474, 482 (Miss. 2002); *Mauck v. Columbus Hotel Co.*, 741 So. 2d 259, 264 (Miss. 1999); *Skipworth v. Rabun*, 704 So. 2d 1008, 1015 (Miss. 1996).  As we have stated:

> [T]he doctrine "is based on expedition of litigation between the same parties by requiring orderliness and regularity in pleadings."  "[J]udicial estoppel will be applied in civil cases where there is multiple litigation between the same parties and one party knowingly 'assert(s) a position inconsistent with the position in the prior' litigation."  However, . . . where the first position asserted was taken as a result of mistake, judicial estoppel should not be invoked.

*Mauck*, 741 So. 2d at 264-65 (citations omitted).

¶18.     Horn Lake argues that Southaven is judicially estopped from annexing the PAA because of the Agreement.  Horn Lake alleges that the Agreement was entered in Cause No. 95-10-1199 in the Chancery Court of DeSoto County, but a review of the record does not support this claim.  No copy of the Agreement included in the record has the style of a case or a civil action number.  The copies of the Agreement included in the record show only the signatures of representatives from Southaven and Horn Lake and do not show the signature of a judicial officer.  Southaven does not address this issue.

¶19.     For the sake of argument, consent decrees cannot ordinarily be modified without agreement by all sides.  *Weeast v. Borough of Wind Gap*, 621 A.2d 1074 (Pa. 1993).  Nevertheless, municipalities that unilaterally request to be let out of an old consent decree may be given special consideration on the ground that an earlier city administration cannot bind succeeding administrations.  *Evans v. City of Chicago*, 10

7

F.3d 474 (7th Cir. 1993). Rule 60(b)(5) of the Mississippi Rules of Civil Procedure allows for relief from a judgment or order where "it is no longer equitable that the judgment should have prospective application."

*Evans* includes a worthwhile discussion of consent decrees and governmental entities and will be reproduced here at length:

> Although the decree purports to last for all time -- and the district court's decision refusing to vacate the decree . . . reflects a belief that the commitments *ought* to run perpetually -- democracy does not permit public officials to bind the polity forever. What one City Council enacts, another may repeal; what one mayor decrees during his four-year term, another may revoke. Today's lawmakers have just as much power to set public policy as did their predecessors. "Chicago" speaks through its elected representatives, and the people are free to upset even the most enlightened policies of earlier times. The current mayor wants to be free of his predecessor's commitment, concluding that more flexibility over budgets will promote the public welfare. People of good will could be on either side of this disagreement; each mayor may have correctly perceived the needs of the moment.

> Governments are in this respect unlike corporations or other contracting parties. A corporate board of directors may enter into commitments that continue after new directors take office; a legislature may not. True, governments may form contracts (for example, to build a new road or repay a loan) and must keep these commitments by virtue of the contract clause of the Constitution, Art. I, § 19, cl. 1. But temporary officeholders may not contract away the basic powers of government to enact laws -- or in this case to adopt budgets -- in the same way natural persons may make enduring promises about their own future behavior. . . .

10 F.3d at 478.

¶20.     Because Horn Lake has failed to show that the Agreement was ever entered as a consent decree in a cause of action, judicial estoppel does not apply. Furthermore, had the Agreement been entered in a cause of action, Southaven could have filed a motion for relief from judgment pursuant to M.R.C.P.

8

60(b)(6), which, under the above precedent, would probably have been granted. This claim is without merit.

### III. WHETHER THE CHANCELLOR ERRED IN DETERMINING THAT THE PROPOSED ANNEXATION WAS REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES.

¶21. We have set out a list of factors to guide the chancellor in his determination of the reasonableness of a city's annexation request. "These factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves." *Bassett v. Town of Taylorsville,* 542 So. 2d 918, 921 (Miss. 1989). The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable. *Id*. at 921-22; *In the Matter of the Extension of the Boundaries of the City of Vicksburg,* 560 So. 2d 713, 716 (Miss. 1990); *In re Enlargement of Corporate Boundaries of the City of Booneville v. City of Booneville*, 551 So. 2d 890, 892 (Miss. 1989); *In the Matter of the Extension of the Boundaries of the City of Jackson*, 551 So. 2d 861, 864 (Miss. 1989).

¶22. A determination of "reasonableness" has taken on a rather dubious connotation in Mississippi jurisprudence:

> As the law now stands, "The judicial function is limited to the question whether the annexation is reasonable." *Jackson,* 551 So. 2d at 863. Reasonableness is determined by analyzing twelve factors announced by this Court in prior cases to see what they "indicate." *Id*. This approach has been criticized as arbitrary for failing to provide adequate guidelines for reaching the ultimate determination. *See In the Matter of the Enlargement of the Corporate Limits and Boundaries of the City of Gulfport,* 627 So. 2d 292 (Miss. 1993), (Smith, J., dissenting, "I am convinced that the test has been expanded so far that now it is absolutely meaningless."); *Matter of Boundaries of City of Vicksburg,* 560 So. 2d 713 (Miss. 1990) (Sullivan, J. dissenting, "

9

'Reasonable' is now determined by the length of the chancellor's nose, or foot, if you prefer."); ***Matter of the Boundaries of City of Jackson***, 551 So. 2d 861, 878 (Miss. 1989) (Blass, J. dissenting, "[T]he proliferation of 'indicia of reasonableness,' . . . can only lead one to the conclusion that 'indicia of reasonableness' are either now devoid of substance or so malleable as to be meaningless."). Although we retain our "indicia" for the purposes of today's decision, we emphasize that fairness to all parties has always been the proper focus of our reasonableness inquiry. Thus, we hold that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness.

***In the Matter of the Extension of the Boundaries of the City of Columbus***, 644 So. 2d 1168, 1171 (Miss. 1994). The test of reasonableness, then, has evolved into the twelve indicia, as well as an emphasis on whether people in the annexed areas are to receive something in exchange for their tax dollars.

¶23. The twelve indicia, as found in ***Columbus***, 644 So. 2d 1168, 1173, as well as ***Jackson***, 551 So. 2d 861, 864, are as follows: (1) the need to expand; (2) the path of growth; (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised; (5) the need for zoning and overall planning in the area; (6) the need for municipal services in the area sought to be annexed; (7) whether there are natural barriers between the city and the proposed annexation area; (8) past performance and time element involved in the city's provision of services to its present residents; (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area; (10) impact of the annexation upon the voting strength of protected minority groups; (11) whether the property owners and other inhabitants of the areas south to be annexed have in the past, and the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy

10

economic and social benefits of the municipality without paying their fair share of taxes; and (12) any other factors that may suggest reasonableness.

### A. The Need for Expansion

¶24.     The chancellor found that Southaven was a rapidly developing area with a "population explosion." Developments containing 4,614 residentials lots had been created since 1990. Between 1997 and 2001, Southaven issued 3,782 building permits for residences. Southaven had experienced "unprecedented commercial growth," including retail establishments, warehousing and light industrial projects. Southaven consisted of 34 square miles and the only vacant land left in the municipality had approved plans for development. State rebated sales tax revenues reflected strong growth, increasing 68% between 1995 and 2001.

¶25.     Horn Lake does not question Southaven's rapid growth, but states that all municipalities within DeSoto County have had rapid growth. It further argues that Southaven has large vacant areas within the city limits, something which we have determined to be relevant. *See, e.g.,* ***Extension of the Boundaries of City of Ridgeland v. City of Ridgeland***, 651 So. 2d 548 (Miss. 1995); ***In re Enlargement and Extension of Municipal Boundaries of City of Biloxi***, 744 So. 2d 270 (Miss. 1999); ***In the Matter of the Extension of Boundaries of City of Columbus***, 644 So. 2d 1168, 1173 (Miss. 1994). Horn Lake points to the testimony of Southaven's planning director which revealed that, in the twelve subdivisions approved since 1997, there were 4,774 vacant lots. Horn Lake also argues that, when one compares the average of single family residence building permits over the last five years, 458, to the 4,774 vacant lots, Southaven has 10.4 years worth of vacant residential lots available for development. Furthermore, in 2001, Southaven issued its lowest number (28) of commercial building permits since 1997.

¶26.    Southaven contends that the numbers relied upon by Horn Lake were merely estimates and not "hard numbers." Indeed, every response that Southaven's planning director made to questions about the current percentage of development in Southaven's subdivisions included the word "probably."[3]

¶27.    Horn Lake also argues that there is no "spillover" growth or development in the PAA, such as there was in *Ridgeland*, and that Southaven had not presented any plans for improving the PAA or to implement municipal services therein. Southaven responds that the uncontradicted evidence showed that the owners of the PAA expected to develop the land in the near future.

¶28.    We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

### B.  Path of Growth

¶29.    Southaven, as originally incorporated, lay to the north and east of Horn Lake, between Horn Lake and the Tennessee state line. In three subsequent annexations, Southaven acquired tracts of land east and south of its city limits. In fourth and fifth annexations, Southaven acquired land west of its city limits up to U.S. Highway 51.

¶30.    The chancellor found that, although a portion of the PAA lay within Horn Lake's path of growth, it also lay within Southaven's path of growth. He placed emphasis on the fact that, even though Horn Lake initiated annexation proceedings to double its size, the land to be annexed did not include the PAA: "Although the proposed area of annexation in this cause lies in extreme close proximity to the City of Horn

_____

[3]When asked what percentage each subdivision was "built out," Southaven's planning director responded "probably a third"; "It's probably a little better than half"; It's probably better than a third built out"; "Oh, probably half. Right at a half"; "Probably half"; "Probably around a third"; and "It's probably close to three-fourths built out."

12

Lake's current boundaries, they did not seek to include it in that annexation, choosing instead to concentrate their efforts of annexation more to the west than to the south."

¶31. Horn Lake argues that Southaven's Comprehensive Plan showed U.S. Highway 51 as the boundary of its annexation planning area, and that, therefore, the PAA was not in Southaven's comprehensive plan.

¶32. Southaven responds that whether or not a tract of land is included in a plan for annexation is irrelevant to the issue of path of growth. Indeed, we have enumerated certain factors to be considered when determining whether a proposed annexation lies in the path of growth: (1) evidence that the PAA is immediately adjacent to the city, *Biloxi*, 744 So. 2d at 280; (2) evidence that the PAA is accessible by in use public streets, highways and roads, *id.*; (3) evidence that the PAA is experiencing spillover of urban development from the city, *id.*; *Ridgeland*, 651 So. 2d at 556; (4) the limited area available for expansion, *Biloxi*, 744 So. 2d at 279; (5) the geography, *id.*; (6) development in the PAA, *id.*; and (7) proposed subdivision development, *Madison*, 650 So. 2d at 497.

¶33. Whether or not Southaven included the PAA in its comprehensive plan is irrelevant to the issue of whether the PAA was in Southaven's path of growth. We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

## C. Potential Health Hazards

¶34. As the PAA is undeveloped with no residents and no structures, the chancellor found that there were no health hazards from sewage or waste disposal which would affect the question of annexation.

¶35. Horn Lake argues that this finding weighs against Southaven. We fail to follow the logic of this argument. In other annexation cases, we have weighed this factor in favor of the annexing municipality

13

because the city's sewage and waste disposal are superior to those in the PAA. *See, e.g.,* ***Hattiesburg***, 840 So. 2d at 87. Because the PAA has no health hazards in the form of inadequately treated sewage or waste, we find that the chancellor's finding that this factor weighed in favor of annexation was not manifestly wrong and that the finding was supported by substantial and credible evidence. However, taking into consideration Horn Lake's argument that there are no health hazards or waste disposal problems in the PAA, this factor is at the least neutral.

## D. Financial Ability

¶36. The chancellor found that Southaven's willingness and financial ability to provide municipal services was "without serious debate." Southaven's bond rating by Standard & Poor's was A+. Sales taxes collections had increased. Assessed property taxes increased 58% from 1998 to 2002. Audits showed that Southaven was a well-run and fiscally responsible municipality. The mayor testified that the budget was based on conservative projections which resulted in a budgetary surplus. The chancellor found that, "Southaven's record for providing services to its citizens in all respects [is] exemplary [and] above and beyond that which is required by law.

¶37. Horn Lake contends that Southaven has absolutely no plans to provide any municipal services to the PAA. The Southaven police testified that, since there were no residents in the PAA, only cows, little police supervision was needed. The proposed Southaven fire station, which was near to but not within the PAA, would be more than adequate to respond to any brush fires on the PAA. Moreover, Horn Lake supplies water and emergency medical coverage to the PAA. Because Miss. Code Ann. § 21-1-33 requires a chancellor to find that "reasonable public and municipal services will be rendered in the annexed territory within a reasonable time" before approving annexation, and because Southaven failed to present any plan for the implementation of municipal services, the chancellor's decision was in error.

14

¶38.    Because the PAA contains only 310 acres and Southaven's proposed police and fire protection are more than adequate for the PAA, and because Southaven has an excellent financial record, we find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

## E.  Need for Zoning

¶39.    The chancellor found that Southaven's building and fire codes, zoning regulations, subdivision regulations and enforcement officers were more than adequate to service not only the existing city but also the proposed area of annexation.  Since the PAA was totally unimproved and faced prospective development, it would benefit from Southaven's regulations.  Furthermore, the PAA is only a part of the tract of land owned by College Road Land Company.  The rest of the tract already lies within Southaven's city limits.  It would be prudent, and the owners wish, to subject the entire tract to only one set of regulations.

¶40.    Horn Lake argues that its zoning provisions are similar to Southaven's.  Therefore, there can be no reasonable finding that there is a need for zoning and planning in the PAA.  ¶41.    We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.  However, taking into consideration Horn Lake's argument that the regulations are similar, this factor is, at the least, neutral.

## F.  Need for Municipal Services

¶42.    After the owners of the PAA indicated that they planned to make a large residential or commercial development, the chancellor found that the PAA would indeed need the municipal services which Southaven offered such as fire and police protection, water and sewage services, brush and garbage removal and code enforcement.  Southaven's services exceeded those offered by DeSoto County.

15

Included in Southaven's annexation proposal was the plan to build a fire station less than half a mile from the PAA. Southaven's fire rating was 5 whereas the PAA's fire rating was 10. The PAA's fire rating would be lowered if the annexation were approved. The chancellor also noted that Southaven would be able to use radar to control speeding on Highway 51, something that, under state law, neither Horn Lake nor DeSoto County could do.

¶43. Horn Lake calls future development of the PAA "highly speculative" because the owners testified that there were no immediate or definite plans for development. In fact, the owners requested development over a twenty-year period. Therefore, the PAA does not require any municipal services now or in the foreseeable future.

¶44. If the chancellor's decision was "highly speculative," Horn Lake's argument is "highly speculative" also. Much testimony supported the chancellor's finding that development of the PAA would begin in the reasonable future. Also, the PAA had been partitioned between three groups of family members, and each of the three groups quitclaimed their interest to the newly-formed College Road Land Company to unify the three tracts so that development could take place. Finally, the owners had had the PAA rezoned from agricultural to "planned business" and hired an engineer to draw up a master plan for development which had been approved by the DeSoto County Planning Commission.

¶45. We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

### G. Natural Barriers

¶46. The chancellor noted that the PAA immediately adjoined Southaven, that the PAA was a portion of a tract of land, a part of which already was within Southaven's city limits, that the east portion of the land shared a common owner with the west portion of the land.

The PAA was intersected by U.S. Highway 51, which was not a barrier to annexation.

¶47. Horn Lake concedes that Highway 51 is not a barrier, but submits that there should be some kind of an effective and permanent barrier to divide cities. Highway 51 was one of the recognized barriers between Horn Lake and Southaven.

¶48. Horn Lake's argument is without merit because the relevant inquiry is whether the PAA is divided by a natural or effective barrier, *not*, as Horn Lake suggests, whether, after annexation, natural or effective barriers exists between two municipalities. *See, e.g.,* **Prestridge v. City of Petal**, 841 So. 2d 1048, 1053 (Miss. 2003); *In re Extension of the Boundaries of the City of Batesville*, 760 So. 2d 697, 705 (Miss. 2000).

¶49. Regardless, we have found that I-55 North was not a barrier to Southaven's expansion. **Matter of City of Horn Lake**, 630 So. 2d 10, 13 (Miss. 1993). Therefore, Highway 51 should not be considered to be a barrier to Southaven's expansion.

¶50. We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

H. Past Performance

¶51. The chancellor found that, based on his earlier discussion, Southaven's past performance in providing services was "not only acceptable, but beyond comparison." The mayor testified that after the last major annexation in 1997, the city immediately began looking for appropriate locations for a temporary fire house, which was later turned into a permanent one. A police substation and a public works park facility were built.

¶52. Horn Lake counters that "Southaven's annexation expert refused to testify that Southaven exceeded all other cities in the State in the fulfillment of promises, and therefore, there was simply no proof to support

17

a finding that Southaven's past performance has been "beyond comparison." Horn Lake also points out that there have been "numerous and repeated 'reportable conditions' within Southaven's audits, some of which were violations of State law." However, Horn Lake finally admits that "the testimony of Southaven's satisfactory fulfillment of its prior annexation promises was unrefuted, and accordingly, this indicia weighs in favor of annexation by Southaven."

¶53.	Because this issue is uncontroverted, we find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

## I. Impact Upon Residents or Owners

¶54.	The chancellor found that no one lived in the PAA, and the only owner had requested annexation by Southaven. A landowner's right to use his land "as he sees fit" is "cherished" by the Court. *Hall v. Wood*, 443 So. 2d 834, 838 (Miss. 1983). *See also Andrews v. Lake Serene Property Owners Assoc.*, 434 So. 2d 1328, 1331, 1333 (Miss.1983). The landowner's use and enjoyment of his property are limited only by the legitimacy of the purpose for which it is used. *Home, Inc. v. Anderson*, 235 So. 2d 680, 683 (Miss. 1970).

"For these rights to be meaningful, each property owner's use and enjoyment of his property must be shielded from unreasonable interference by others--these 'others' ranging from the faceless sovereign to one's next door neighbor." *Hall*, 443 So. 2d at 838.

¶55.	These principles apply to the case at bar. The landowners wished to be annexed by Southaven because the greater part of the tract of land had already been annexed by Southaven, and they did not want the tract to be divided by two governmental entities. These wishes should be followed unless an objector can show that the landowners' wishes are not legitimate. Annexation is certainly a legitimate purpose.

18

¶56. We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

### J. Impact on Minority Voting Strength

¶57. The chancellor found that, since no one lived in the PAA, this factor has no relevance. We find that the chancellor's finding that this factor is neutral was not manifestly wrong and that the finding was supported by substantial and credible evidence.

### K. Whether the Owners Would Benefit from Proximity to Southaven

¶58. The chancellor found that after the PAA is developed for residential or commerical purposes, and considering, Southaven's rapid growth, the owners would enjoy a substantial increase in the value of the property.

¶59. Horn Lake points out that the PAA was a cow pasture. "Other than some occasional glances from Southaven's police officers, there was zero proof that either the cattle or the landowners are enjoying benefits from Southaven without paying their fair share of taxes."

¶60. It is true that the PAA has not benefitted from Southaven's provision of services because it is pasture land. Therefore, this factor should be in favor of Horn Lake.

### L. Other Factors

¶61. The chancellor found that, considering Southaven's long-standing relationship with the Horn Lake Water Association, which had the certificate rights to the water and sewer of the PAA, Southaven's position was enhanced. A development which adjoined the PAA's northeast corner, would enhance the PAA's development.

¶62. Horn Lake argues that if the annexation were allowed, it would be yet another step toward the city being landlocked. However, in view of the fact that Horn Lake has annexed a substantial amount of land

19

in the recent past, the Court should find that Horn Lake will not be in danger of being landlocked by Southaven's annexation of the PAA.

¶63.    We find that the chancellor's finding that this factor weighed in favor of Southaven was not manifestly wrong and that the finding was supported by substantial and credible evidence.

## CONCLUSION

¶64.    We find that Horn Lake's claims of equitable estoppel and judicial estoppel are without merit because of the prevailing law that  succeeding city administrations cannot be bound by the actions of preceding city administrations.  We further find that the chancellor's dismissal of Horn Lake's objections and his findings that Southaven's proposed annexation was reasonable under all the circumstances were not manifestly wrong and that his findings were supported by substantial and credible evidence. Therefore, the trial court's judgment is affirmed.

¶65.    **AFFIRMED.**

**SMITH, P.J., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. COBB, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. PITTMAN, C.J., AND DIAZ, J., NOT PARTICIPATING.**