# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-01472-SCT

*MAYOR OKOLOISE, M.D. AND HOPE MEDICAL
SERVICES, LLC*

*v.*

*WILLIAM FRANKLIN YOST, M.D. AND
DOCTOR'S MEDICAL CENTER OF PICAYUNE,
PLLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/25/2017 |
| TRIAL JUDGE: | HON. M. RONALD DOLEAC |
| TRIAL COURT ATTORNEYS: | PAUL MANION ANDERSON |
| | L. CLARK HICKS, JR. |
| | VICK K. SMITH |
| | SAMUEL STEVEN McHARD |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | L. CLARK HICKS, JR. |
| | VICK SMITH, III |
| | WILLIAM A. WHITEHEAD, JR. |
| ATTORNEYS FOR APPELLEES: | PAUL MANION ANDERSON |
| | SAMUEL STEVEN McHARD |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 09/05/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    This appeal involves a business dispute between two physicians. The chancellor awarded equitable damages in the amount of $188,622. We find reversible error and render judgment.

**FACTS**

¶2.     William Franklin Yost, M.D., owned and operated a pain-management clinic in Slidell, Louisiana—Doctors Medical Center, LLC (DMC-Slidell).

¶3.     Within six months of opening DMC-Sidell, the Louisiana State Board of Medical Examiners (LSBME) began an investigation of Dr. Yost for illegally operating a pain-management clinic.  On April 24, 2012, Dr. Yost wrote the LSBME and stated, "effective July 13th, 2012, I will no longer be practicing in the area of chronic pain management by the use of narcotic therapy."  As a result, Dr. Yost and officials with the LSBME agreed that Dr. Yost would retire and cease the practice of chronic pain management through narcotic therapy.  DMC-Slidell closed on July 13, 2012.[1]

¶4.     Dr. Yost then opened a clinic in Picayune, Mississippi—Doctors Medical Center of Picayune, LLC (DMC-Picayune).  In the summer of 2012, Dr. Yost began seeing patients, including his former patients from DMC-Slidell.  At that time, the Mississippi State Board of Medical Licensure (MSBML) required that all pain-management clinics be registered and issued a certificate.  Dr. Yost submitted an application for registration to the MSBML in June 2012, but the certificate was not immediately issued.  Dr. Yost continued treating patients for pain management, without a certificate, until November 2012, when he reapplied.  The MSBML then issued Dr. Yost a certificate on November 16, 2012.

---

[1]  The investigation resulted in Dr. Yost's voluntary surrender of his Louisiana medical license on November 19, 2012.  Dr. Yost previously represented to the LSBME that he would only provide traditional medical services after the pain clinic closed, if he practiced medicine at all.  At trial, Dr. Yost testified that he had fully intended to retire when the clinic closed.

¶5. Mayor Okoloise, M.D., met with Dr. Yost in June 2012 and began a discussion about affiliating with Dr. Yost. Dr. Yost informed Dr. Okoloise that he had a pain-management practice and that he was looking for another physician to take over after he retired in the near future.

¶6. As a result of these discussions, on August 1, 2012, Dr. Okoloise began practicing medicine with Dr. Yost at DMC-Picayune. They formalized their relationship and signed a "Personal Services Contract" on August 13, 2012. Dr. Yost signed the contract as the member manager of DMC-Slidell and DMC-Picayune, but not in an individual capacity.

¶7. The contract provided that Dr. Okoloise agreed to provide certain physician services to DMC-Slidell and DMC-Picayune, commencing August 1, 2012. The initial term of the contract was for one year with automatic renewal, unless one of the parties gave the other party notice in writing of the intention not to renew the contract. The contract provided that the medical clinics would at all times operate in accordance with all applicable provisions of law and that failure to operate in accordance with applicable laws, rules, regulations, or directives would be a material breach of the contract. The contract provided that early termination would be accepted if either party committed a material breach or lost the right to practice medicine and if the nonbreaching party gave the breaching party sixty days' written notice of the breach and the intent to terminate. The contract was drafted by Dr. Okoloise's attorney, James Hautot, from Lafayette, Louisiana, but both parties contributed to the final contract terms.

¶8. At trial, Dr. Okoloise testified that, at the time he signed the agreement, he was unaware of the LSBME's investigation of Dr. Yost and he was unaware that Dr. Yost was not properly credentialed in Mississippi. Dr. Yost testified that, from the time the contract was signed until Dr. Okoloise left, Dr. Yost only practiced medicine in Mississippi. Dr. Yost believed that because the LSBME Board had no jurisdiction in Mississippi, he was not violating his promise not to practice pain management.

¶9. On September 4, 2012, Dr. Yost, his wife, and Dr. Okoloise, met with Hautot in Lafayette, Louisiana. During this meeting, the parties discussed Hautot's representation of Dr. Yost before the LSBME. Both Dr. Okoloise and Dr. Yost executed a written consent to Hautot's representation of Dr. Yost.

¶10. The MSBML was not aware of the investigation of Dr. Yost by the LSBME. On November 16, 2012, the MSBML approved Dr. Yost's application practice in pain management and issued the required certificate.

¶11. Three days later, on November 19, 2012, Dr. Yost surrendered his Louisiana medical license.

¶12. One month later, on December 19, 2012, Dr. Okoloise resigned from DMC-Picayune. Dr. Okoloise delivered a resignation letter to Dr. Yost. The letter stated that the resignation was effective immediately, and it listed a number of allegations against Dr. Yost and DMC-Picayune. Dr. Okoloise testified that the clinic was being operated illegally, and, thus he believed the contract to have been void at its inception. Dr. Okoloise did not provide a sixty-

4

day notice of his intent to terminate the contract. Dr. Okoloise testified that he had notified Dr. Yost on three different occasions of numerous breaches but that he did not mention his intent to terminate the contract until December 19, 2012.

¶13. After Dr. Okoloise resigned, several other DMC-Picayune employees—Julie Brinkman, Kimberly Marshall, and Camille Dimaggio—unexpectedly resigned. Another employee, Joanne Myers, had resigned a few days before.

¶14. Testimony was presented that Dr. Okoloise had made plans to open another clinic before he submitted his resignation. In fact, Dr. Okoloise opened a clinic under the name of Hope Medical Services, LLC (Hope Medical). On November 16, 2012, Dr. Okoloise executed a lease agreement on a space to house Hope Medical. Dr. Okoloise offered several members of the DMC-Picayune staff an employment opportunity at Hope Medical. The offers were made while Dr. Okoloise was employed by DMC-Picayune. In addition, Dr. Okoloise instructed the staff to access the patient list of DMC-Picayune and to send out letters that provided the patients with notice of Dr. Okoloise's new address.[2]

---

[2] The MSBML requires all physicians in Mississippi to notify patients of their relocation. The Mississippi State Board of Medical Licensure Policy 3.17 (2009), which was introduced at trial as Exhibit D-50, states as follows:

Closing a Physician's Practice
When a physician ceases to practice, whether by relocation, retirement, liability, or death, certain obligations are due the patients of the physician. If relocation to another site in the same patient area, the problems are mainly logistical in making sure the patients know about the move. If leaving a partnership or group practice, the physicians remaining should not unduly hinder patient inquiries as to the location of the departing physician. The

5

¶15. On January 2, 2013, Hope Medical opened in Picayune. Hope Medical employed Dr. Okoloise, Myers, Brinkman, Marshall, and Dimaggio.

¶16. Despite the departure of Dr. Okoloise and the staff members, Dr. Yost continued to operate DMC-Picayune. Dr. Yost employed temporary staff and decreased the number of patients. Dr. Yost also sought a buyer for the clinic.

¶17. Dr. Yost entered negotiations with Dr. Stephanie Dyer to purchase DMC-Slidell and DMC-Picayune. Dr. Yost and Dr. Dyer signed a memorandum of understanding for the sales price of $1,250,000, but the sale was never finalized. Dr. Dyer backed out after a conversation with Dr. Okoloise in which he told her that a noncompetition agreement was in place. Dr. Okoloise denied he had made that statement.

¶18. The Drug Enforcement Agency (DEA) began an investigation of Dr. Yost and DMC-Picayune. Following the investigation, the DEA did not file any charges against Dr. Yost. But, on February 13, 2013, the DEA closed DMC-Picayune. That same day, Dr. Yost voluntarily surrendered his Mississippi medical license. The licensure surrender noted that Dr. Yost had surrendered his Louisiana medical license for a pattern and practice that violated Louisiana's pain-management rules and that his conduct was in violation of the Mississippi Medical Practice Act.

---

patients of the departing physician should be informed of the physician's new address and offered the opportunity to have their medical records sent to the departing physician at the new practice location. It is unethical to withhold such information upon a patient's request.

¶19. On January 7, 2013, Dr. Yost and DMC-Picayune commenced this action in the Chancery Court of Pearl River County. The complaint named as defendants Dr. Okoloise, Hope Medical, and the four former employees of DMC-Picayune. The complaint asserted twenty claims and demanded a judgment in the amount of the fair market value of the clinic, which was valued at $1,198,000.

¶20. After trial, the chancellor entered an opinion and final judgment that addressed each claim. The chancellor dismissed the following claims: accounting, breach of fiduciary duty and breach of duty of loyalty, constructive trust, unjust enrichment, embezzlement and misappropriation, slander per se, libel, unfair competition, tortious interference with business relationship, tortious interference with business, breach of duty of good faith and fair dealing, fraudulent or negligent misrepresentation, civil conspiracy, intentional or negligent infliction of emotional distress, punitive damages, indemnification, and injunctive relief. Yet the chancellor determined that there was sufficient evidence to sustain several claims against Dr. Okoloise and Hope Medical: trover/conversion, defamation, breach of contract, breach of duty of good faith, and misappropriation of trade secrets.

¶21. The chancellor found that "[Dr. Yost and DMC-Picayune] should be equitably compensated for the damages they incurred for these claims and losses." He awarded a judgment against Dr. Okoloise and Hope Medical in the amount of $188,622. The chancellor later modified the order and final judgment on post-trial motions.

**STANDARD OF REVIEW**

¶22. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *White v. White*, 26 So. 3d 342, 346 (Miss. 2010) (internal quotation marks omitted) (quoting *R.K. v. J.K.*, 946 So. 2d 764, 772 (Miss. 2007)). Further, we will not reverse a chancellor's findings "where there is substantial evidence supporting those findings." *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993) (citing *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991)). We recognize that "the chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor's authority by replacing his judgment with its own." *Id.* (citing *Mullins v. Ratliff*, 515 So. 2d 1183, 1189 (Miss. 1987)). "For questions of law, we employ a de novo standard of review and will only reverse for an erroneous interpretation or application of the law." *Boyd v. Tishomingo Cty. Democratic Exec. Comm.*, 912 So. 2d 124, 128 (Miss. 2005) (citing *In re Mun. Boundaries of Southaven*, 864 So. 2d 912, 917 (Miss. 2003)).

## DISCUSSION

¶23. Dr. Okoloise and Hope Medical raise four issues on appeal:

I. Whether the chancellor correctly found that Dr. Yost proved every element of slander, including special harm caused by the alleged slander.

II. Whether the chancellor correctly held that a physician's regulatory obligation to notify patients of a relocation of his practice necessarily constitutes conversion of confidential customer information.

8

III.    Whether the chancellor correctly held that Dr. Okoloise breached his personal services contract with Dr. Yost and DMC-Picayune.

IV.     Whether the chancellor utilized and calculated a proper measure of damages for business losses.

Because this Court has determined that the issue on damages is dispositive, the remaining issues will not be addressed.

¶24.    Here, we must review a chancellor's award of monetary damages. The award of monetary damages is a legal remedy, which is typically brought in circuit court. Chancery courts are courts of equity. Miss. Const. art. 6, § 159(a). Mississippi has determined that the line between courts of law and courts of equity should be preserved. *See Cotton States Life Ins. Co. v. Cunningham*, 141 Miss. 474, 106 So. 766, 767 (1926) ("We must remember that our Constitution has established a well-defined line of demarcation between the courts of law and the equity courts . . . ."). The award of monetary damages is a legal remedy properly brought in circuit court.

¶25.    In *Derr Plantation, Inc. v. Swarek*, this Court noted,

> As long as the chancery court's equity jurisdiction has attached, the chancery court has discretion to award legal and punitive damages.
>
> Conversely, if the complaint seeks legal relief, even in combination with equitable relief, the circuit court can have proper subject matter jurisdiction. In fact, if there is some doubt as to whether a case is within the jurisdiction of the chancery court, the case is better tried in circuit court because it is more appropriate for a circuit court to hear equity claims than it is for a chancery court to hear actions at law since circuit courts have general jurisdiction but chancery courts enjoy only limited jurisdiction.

*Derr Plantation, Inc. v. Swarek*, 14 So. 3d 711, 716 (Miss. 2009) (internal quotation marks

9

omitted) (citations omitted). Therefore, a chancellor certainly may enter a judgment that awards monetary damages. Further, we note that there was no challenge to the chancery court's jurisdiction.

¶26. After four days of trial, the chancellor issued a detailed, well-written decision. We must review the chancellor's findings to determine whether the chancellor's conclusions were manifestly wrong, clearly erroneous, or applied an erroneous legal standard.

¶27. We start with the chancellor's Opinion and Final Judgment. The chancellor ruled,

The Court having sustained the Plaintiffs claims under Count V (Trover/ Conversion), Count VIII (Defamation), Count X (Willful, Tortious Breach of Contract/Breach of Contract), and Count XIV (Conversion/ Misappropriation of Trade Secrets), *the Court finds that the Plaintiffs should be equitably compensated for the damages they incurred for these claims and losses.* Actual damages must be shown in order for a Plaintiff to recover more than mere nominal damages. ***Chevron Oil Co. v. Snellgrove***, 253 Miss. 356, 364, 175 So. 2d 471, 474 (Miss. 1965).

The Court heard testimony from Michele Avery, CPA, expert witness for the Plaintiffs, and Nancy Clinton, CPA, expert witness for the Defendants, as to the value and other financial aspects of Doctor's Medical Center. Ms. Avery opined that the business had a value of $1,198,000 as of December 19, 2012. She used an income approach with discount as to her valuation positing that the medical practice was being transferred from Slidell to Picayune as opposed to a shut down and a fresh start up. She noted that revenue for DMC went up with the Mississippi clinic operation. She assumed both licenses for Dr. Yost were in place on her date of valuation and Ms. Carillo [Special Projects Officer for MSBML] testified to such. When asked about the impact of Dr. Yost surrendering his Louisiana license with a tender date of November 19, 2012, and an acceptance date of December 3, 2012, Ms. Avery testified that the elements of the practice for DMC Picayune were still in place on December 19, 2012. Those elements for valuation purposes are (1) a patient list, (2) a work force in place including a physician other than Dr. Yost, (3) a clinic location, and (4) telephone numbers and contact information for patients. Her DMC valuation was based on the last date these factors were in place for

10

Plaintiffs and prior to the late afternoon walkout by Dr. Okoloise and the entire DMC staff on the same date.

Ms. Clinton, on the other hand, evaluated Ms. Avery's valuation and felt that the business had no value on that date. The Court finds neither of these extremes to be reasonable nor equitable under the totality of the circumstances supported by the credible evidence at trial. Certainly, the business had some value. However, Ms. Avery's valuation is problematic because of certain assumptions she made, the first being the assumption of an ongoing similar patient volume (the Court is not convinced that such was certain given the circumstances even before Dr. Okoloise left the clinic) and the second being that the clinic and its physicians were properly licensed to own and operate a pain management clinic (much of her financial analysis was based on the period of time prior to Dr. Yost receiving the pain management certificate dated November 16, 2012).

Given the numerous Plaintiffs' claims that the Court has denied, the Court is, based upon the preponderant and credible facts from trial, of the opinion and *finding that the value of the entire business as urged by Plaintiffs is not an equitable measure of recovery against the Defendants in this matter*.

Included in Ms. Avery's valuation [Exhibit P-15] is an estimated annual income statement, which indicates an annual net income of $323,352.00 for the clinic, or $26,946.00 per month on average. Dr. Okoloise and the DMC staff left on December 19, 2012, with approximately 7 months left in Dr. Okoloise's first year long contract. *The Court finds that an appropriate award of damages for compensation of the claims sustained and damages suffered amounts to $188,622.00 (or $26,946.00 x 7 months)*. The Court notes that DMC had an income/profit stream for December 2012 and January and February 2013 prior to its closing. However, as a matter of equity, the Court deems the above damages as reasonable and proper, without discount, and equitably supported by the credible evidence at trial.

Plaintiffs shall have judgment in the amount of $188,622.00 from the Defendants, jointly and severally, and which judgment amount shall bear interest at 4% per annum from this date until paid in full. Plaintiffs are afforded all lawful judgment execution and collection procedures for recovery of the judgment with interest.

(Emphasis added.)

11

¶28.  After consideration of the post-trial motions, the chancellor entered an Order on Post-Trial Motions that corrected the Opinion and Final Judgment as follows:

V.

Defendants assert that the Court should have applied a before and after rule as to profits; that Plaintiffs offered no such evidence; and that the Court's reliance on Exhibit P-15 (Ms. Avery's Valuation of Doctors Medical Center of Picayune, LLC, as of December 19, 2012) is misplaced. Defendants argue that equity is not a basis for lost profit damages which are not attributable to the actions of Dr. Okoloise. Defendants posit that the DEA closure of DMC Picayune on or about February 13, 2013, was an independent, intervening, or superceding [sic] cause for which they have no liability. Plaintiffs counter that Defendants pled no such affirmative defense

. . . .

Damages Awarded By The Court
VI.

In reviewing the Answer And Affirmative Defenses filed by Defendants, the Court finds no such affirmative defense of independent, intervening, or superceding [sic] cause was pled. Thus, the Court will not consider that post trial argument or position. Moreover, *the Court's ruling and damage award is based upon the overall course of conduct and dealing between the parties as set forth in the Opinion and Final Judgment as to the Amended Complaint Counts (4 of 20 pled) sustained by the Court from the evidence at trial*.

. . . .

Ruling On Defendants' Motions
VIII.

The Court utilized the credible evidence before it at trial. The Court dismissed with prejudice numerous counts pled by Plaintiffs and granted a general verdict on Counts V, VIII, X, and XIV for general compensatory damages. There is no finding nor adjudication in the Opinion and Final Judgment by the Court that the damages awarded are for lost profits. The law does not require that a perfect measure of damages be proven by Plaintiffs.

By way of clarification, the Court finds that the *Opinion And Final Judgment* should be, and hereby is, amended by striking the following on page 44:

12

"Included in Ms. Avery's valuation [Exhibit P-15] is an estimated annual income statement. which indicates an annual net income of $323,352.00 for the clinic, or $26.946.00 per month on average." (emphasis added). In the sentence following, the *Opinion and Final Judgment* should be, and hereby is, amended by striking (or $26,946 x 7 months) with the period for that sentence coming after $188,622.00. (emphasis added).

Thus, the paragraph at pages 44 and 45 is amended to read: "Dr. Okoloise and the DMC staff left on December 19, 2012. with approximately 7 months left in Dr. Okoloise's first year long contract. The Court finds that an appropriate award of damages for compensation of the claims sustained and damages suffered amounts to $188,622.00. The Court notes that DMC had an income/profit stream for December 2012 and January and February 2013 prior to its closing. *However, as a matter of equity, the Court deems the above damages as reasonable and proper, without discount, and equitably supported by the credible evidence at trial.*"

(Italicized emphasis added.)

¶29.  Our review begins with the assessment of damages.  In the Opinion and Final Judgment, the chancellor found that Dr. Yost and DMC-Picayune were entitled to monetary damages of seven months (the period remaining in the contract) of DMC's estimated profits. However, in the Order on Post-Trial Motions, the chancellor struck this rationale and granted damages "as a matter of equity . . . and equitably supported by the credible evidence at trial."

¶30.  No such legal principle permits equitable damages.  It is fundamental that monetary damages are a legal remedy.  Although equitable remedies are available, such does not include the award of monetary damages.  Thus, we find no legal authority to support the chancellor's finding that "the Plaintiffs should be equitably compensated for the damages they incurred for these claims and losses," nor his finding that "as a matter of equity, . . . the above damages [were] reasonable and proper, without discount, and equitably [were]

13

supported by the credible evidence at trial."

¶31. Instead, the law of damages requires that, for each claim on which the plaintiffs prevail, there is a clear methodology to determine and award damages. Equity is not a proper methodology for determining losses. *Warren Mills v. New Orleans Seed Co.*, 65 Miss. 391, 394, 4 So. 298, 298 (1888) (when damages are an adequate remedy, equity will not interfere). We must consider whether the chancellor used the proper method of calculation of damages for each claim.

### A. Damage Methodology for Trover and Conversion Claim

¶32. A leading treatise states the following about the proof of damages to prevail on a claim for trover or conversion:

> An action in trover is a special action of trespass on the case for recovery of damages for the wrongful conversion of personal property. Conversion results form the intentional exercise of control or dominion over goods inconsistent with the true owner's right. To support an action in trover for conversion, the plaintiff must have a special or general title to the property or immediate right of possession, and the defendant must have wrongfully exerted some act of dominion over the property inconsistent with and destructive of the plaintiff's title, possession or right to possession. . . .
>
> *The burden of proof as to damages arising from conversion is on the party claiming such damages. The general measure of damages is the value of the property at the time of the conversion,* plus interest. There are instances in which unusual and extraordinary losses such as action and consequential damages, including lost profits, can be recovered in an action for conversion. Such losses are generally recoverable if, under the circumstances of the case, it can be said that the parties to the litigation, at the time of the conversion, contemplated these consequences as a probable result. *Elements of damages other than fair market value, in order to be recoverable, must also not be uncertain, unnatural, remote as to cause, or speculative or conjectural in effect.*

14

Johnny C. Parker, *Mississippi Law of Damages* § 35:28 (3d ed.), Westlaw (database updated Sept. 2018) (footnote omitted) (emphasis added).

¶33. Here, neither the Opinion and Final Judgment nor the Order on Post-Trial Motions refers to any evidence presented, and there is no finding by the chancellor as to the value of the property converted. Further, while this case may have presented an instance in which unusual and extraordinary losses occurred that could have entitled Dr. Yost or DMC-Picayune to recover lost profits from conversion, there was no evidence presented and no finding by the chancellor as to how the conversion caused damage and what amount of profits were lost as a result of the conversion. Further, the chancellor clearly stated that his award of damages was equitable in nature and was not based on lost profits. As a result, we find that the chancellor was manifestly wrong and clearly erroneous to enter an award for damages based on the Plaintiffs' claims for trover or conversion.

B.      *Damage Methodology for Trade-Secrets Claim*

¶34. The Mississippi Uniform Trade Secrets Act provides that damages for misappropriation must be the "actual loss caused by misappropriation" or "the unjust enrichment caused by misappropriation." Miss. Code Ann. § 75-26-7 (Rev. 2016). This Court has ruled that the loss of net profits is appropriate for recovery in a conversion and trade-secret misappropriation action. ***Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.***, 725 So. 2d 902, 915 (Miss. 1998). In ***Fred's***, a pharmacy brought an action against a former employee and competitor for trade-secret misappropriation and other claims. ***Id.*** at 907.

15

This Court found that the pharmacy's presentation of only gross-profit figures was inadequate to entitle the pharmacy to damages for loss of profits for the competitor's use of the pharmacy's customer list. *Id.* at 915.

¶35. Here, neither the Opinion and Final Judgment nor the Order on Post-Trial Motions refers to any evidence presented and there is no finding by the chancellor as to the actual loss caused by misappropriation or the unjust enrichment caused by misappropriation. Further, the chancellor clearly stated that his award of damages was equitable in nature and was not based on lost profits. As a result, we find that the chancellor was manifestly wrong and clearly erroneous to enter an award for damages based on the Plaintiffs' claims for trover, conversion, or misappropriation of trade secrets.

### C. Damage Methodology for Defamation Claim

¶36. To support the defamation claim, Dr. Yost relies on the testimony of former patient Joanne Brennan. Brennan testified about one visit with Dr. Okoloise in 2012. According to Brennan, during the visit, Dr. Okoloise advised that "[Dr.] Yost did not have a license to be treating [her]." When asked if Dr. Okoloise made any further comments, Brennan responded, "that was pretty much the extent of it."

¶37. A claim for defamation requires the plaintiff to prove: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) actionability of the statement irrespective of special harm or the existence of special harm caused by the

16

publication." ***Blake v. Gannett Co., Inc.***, 529 So. 2d 595, 602 (Miss. 1988) (citing ***Chatham v. Gulf Pub. Co., Inc.***, 502 So. 2d 647, 649 (Miss. 1987)). The chancellor found that Dr. Okoloise's statement to Brennan was sufficient evidence of slander.[3] The chancellor further found that as a result of the statement, Dr. Yost and DMC-Picayune suffered financial harm.

¶38. In ***Speed v. Scott***, 787 So. 2d 626, 632 (Miss. 2001), this Court stated,

> Slander is an unusual tort, where mere spoken words become actionable. Everyday life contains risks of sharp words and wounded feelings, but also worse. Brought forward from common law origins is a balancing of the competing interests of one person to speak and another to be free from harm. Part of the balance struck is to require concrete harm before spoken words are actionable.

Here, there was no evidence that Dr. Okoloise's statement to Brennan caused harm, much less "concrete harm." The chancellor did not identify any financial harm caused by the conversation between Dr. Okoloise and Brennan. Instead, the chancellor awarded $188,622 in equitable damages, an award derived from the estimated net income of DMC-Picayune by Dr. Yost's expert's business valuation. We find that the chancellor's award of damages for defamation lacks evidentiary support and that it was manifestly wrong or clearly erroneous.

D. *Damage Methodology for Breach-of-Contract Claim*

¶39. The purpose of awarding damages is to compensate an injured party for the injury sustained, whether the damages arise by reason of a tort or the breach of a contract. Parker, *supra*, at § 2:1. The plaintiffs have the burden to present evidence of loss from the alleged

---

[3] Dr. Yost's slander per se claim was dismissed.

17

injury. ***Cenac v. Murry***, 609 So. 2d 1257, 1274 (Miss. 1992). "[A] plaintiff seeking monetary damages for breach of contract must put into evidence, with 'as much accuracy as' possible, proof of the damages being sought." ***Bus. Commc'ns, Inc. v. Banks***, 90 So. 3d 1221, 1225 (Miss. 2012) (quoting ***Thomas v. Global Boat Builders & Repairmen, Inc.***, 482 So. 2d 1112, 1116 (Miss. 1986)). "Without proof of actual monetary damages, a plaintiff cannot recover compensatory damages under a breach-of-contract action." ***Id.*** (emphasis omitted).

¶40.    To recover, Dr. Yost and DMC-Picayune had to prove economic damages proximately caused by Dr. Okoloise and Hope Medical. As evidence of his loss, Dr. Yost presented a business valuation of DMC-Picayune that estimated the value on the date Dr. Okoloise resigned. Michele Avery, Dr. Yost's expert witness, opined that the business had a value of $1,198,000 as of December 19, 2012. She used an income approach, with discount, in her valuation, positing that the medical practice was being transferred from Slidell to Picayune, instead of its being shut down and freshly restarted. She estimated an annual net income of $323,352 for the clinic, or $26,946 per month, on average. At trial, she opined that the business had no value following Dr. Okoloise's departure.

¶41.    It appeared that the chancellor, in the Opinion and Final Judgment, awarded economic damages based on the loss of income. Initially, the chancellor determined that seven months remained on the contract. The chancellor relied on Dr. Yost's business valuation, as outlined by Avery, and calculated seven months of average monthly income for DMC-Picayune using

18

a worksheet from an appraisal of the market value of DMC-Picayune (7 x $26,946 = $188,622). This appears to be the chancellor's determination that Dr. Okoloise breached the contract and that Dr. Yost incurred lost profits for seven months.

¶42. However, in the Order on Post-Trial Motions, the chancellor amended the findings to exclude any reliance on Dr. Yost's business valuation and the evidence presented on lost-profits calculations. Nevertheless, the final judgment that is before us awards damages in the sum of $188,622, without any explanation but that it is an "equitable" award of damages.

¶43. The chancellor's findings and calculations are misleading because they do not take into consideration DMC-Picayune's income from Dr. Yost's continued treatment of patients after Dr. Okoloise's resignation, as well as the diminished overhead costs. Also, there were no adjusted numbers for the loss of salary overhead and related expenses following Dr. Okoloise's and his staff's departures. There was no evidence about the financial impact of the closure of DMC-Slidell after Dr. Yost's surrender of his license and the opening of DMC-Picayune as a separate and new medical clinic.

¶44. Additionally, there was no evidence of actual net profit before and after Dr. Okoloise left. Dr. Yost and DMC-Picayune did not pursue an accounting of any profits achieved by Hope Medical that were lost by DMC-Picayune. The chancellor acknowledged the absence of lost-profit data and determined that lost profits need not be proved, because the law does not require a perfect measure of damages.

¶45. Moreover, despite the chancellor's removal in the opinion of his reliance on Dr.

19

Yost's business valuation, it appears that the chancellor still relied on Dr. Yost's business valuation in his calculation of damages. Indeed, he awarded the same amount of damages initially calculated under the business-valuation analysis, $188,622. "Business valuation analyses . . . have been utilized for the purposes of determining a party's interest in a business for purposes of divorce and eminent domain." *Lane v. Lampkin*, 175 So. 3d 1222, 1229 (Miss. 2015) (citing *Gutierrez v. Gutierrez*, 153 So. 3d 703 (Miss. 2014) (divorce); *Singley v. Singley*, 846 So. 2d 1004 (Miss. 2002) (divorce); *Dedeaux Utility Co., Inc. v. Gulfport*, 63 So. 3d 514 (Miss. 2011) (eminent domain)). "Likewise, valuations have been used in cases of shareholder dissension to corporate merger." *Id.* (citing *Richton Bank & Trust v. Bowen*, 798 So. 2d 1268 (Miss. 2001)). But such analyses are not appropriate for breach-of-contract cases. *Id.*

¶46. There must be sufficient evidence from which the chancellor can, with reasonable certainty, assess a proper measure of economic loss proximately caused by a breach of contract. *See Warren v. Derivaux*, 996 So. 2d 729, 737 (Miss. 2008) ("A party seeking recovery for lost profits must establish the claim with reasonable certainty, not based on mere speculation and conjecture." (citing *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987))). An award of economic damages must be based on proper economic data, not equity. Here, the record lacks sufficient evidence to support the chancellor's award of equitable damages for Dr. Yost and DMC-Picayune's breach-of-contract claim.

**CONCLUSION**

20

¶47. The chancellor's findings were based on equitable measures, with no legal basis, and are therefore manifestly wrong. The record evidence is insufficient to show losses attributable to Dr. Okoloise or Hope Medical. The judgment is manifestly wrong, clearly erroneous, and not supported by credible evidence. We reverse and render.

¶48. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶49. I agree with the majority's decision to reverse and render the judgment in favor of Dr. Yost and DMC-Picayune, but for different reasons. According to findings by the United States Drug Enforcement Administration (DEA), "prescription drug abuse continues to be the nation's fastest growing drug problem," with opioid pain relievers most often implicated in overdose incidents. Drug Enf't Admin., DEA-NWW-DIR-017-13, 2013 National Drug Threat Assessment Summary 2-3 (2013). And these drugs are acquired easily through "numerous rogue pain management clinics," commonly known as "pill mills," in which patients are given brisk, casual examinations for which they pay cash in exchange for opioid prescriptions. *Id.* at 4. "Pill mill operators continually devise methods to subvert regulations and investigations while attracting patients." *Id.*

¶50. The subject matter of the contract between Dr. Yost and Dr. Okoloise was the operation of an illegal pain management clinic—a pill mill. Its operation unquestionably was

21

illegal. Dr. Yost opened the clinic in Picayune, Mississippi, after his Slidell, Louisiana, pain management clinic was closed. The closure occurred after Dr. Yost had been investigated by the Louisiana State Board of Medical Examiners (LSBME) for operating a pain management clinic illegally. As part of the resolution of that investigation, Dr. Yost agreed to retire and cease the practice of treating chronic pain with narcotic drugs. But instead of abiding by that agreement, Dr. Yost immediately opened an identical clinic in Mississippi, treating the same patients, and engaging in the same business he had promised Louisiana officials he would forego forever. When the LSBME discovered these nefarious actions, it instigated proceedings that resulted in Dr. Yost's surrender of his Louisiana medical license.

¶51. According to the testimony of Francis Carillo with the Mississippi State Board of Medical Licensure (MSBML), "if a doctor has his license suspended, revoked, or surrendered by another state agency or medical board, that is grounds for the Mississippi state board to take . . . similar action." At the time Dr. Yost opened the Picayune clinic, he was in breach of his agreement with LSBME not to practice the treatment of pain management with narcotic drugs. Thus, although MSBML was unaware of the LSBME's agreement with Dr. Yost, his actions would have been grounds for disciplinary action in Mississippi.

¶52. In addition to these licensure problems, Dr. Yost opened the Picayune clinic and engaged in a pain management practice for months without first securing a certificate of operation. Carillo testified that Mississippi law prohibits a physician from operating a pain

22

management clinic without such a certificate. Yet Dr. Yost ran the clinic without a certificate, in violation of Mississippi law, for almost six months. On August 13, 2012, when Dr. Yost and Dr. Okoloise executed the contract for Dr. Okoloise to join the practice, the clinic was dispensing large quantities of narcotic drugs to its patients without a pain management certificate in blatant violation of the law. The chancellor found that Dr. Okoloise had been aware of Dr. Yost's problems with the LSBME.

¶53. Any doubt about the illegal nature of the Picayune clinic does not withstand the fact that the DEA raided the clinic and closed it on February 13, 2013. In conjunction with the clinic's closure, Dr. Yost lost his license to practice medicine in Mississippi. Other evidence exposes the clinic as an illegal pill mill. The clinic accepted only cash payments. Clinic employees testified that Dr. Yost wrote opioid prescriptions for several patients whose arms exhibited "track marks" indicative of drug abuse. Others testified that Dr. Yost prescribed opioids in exchange for the patients' performance of odd jobs, such as working on Dr. Yost's car.

¶54. I would find that Dr. Yost's lawsuit against Dr. Okoloise is barred by the doctrine that "the law . . . will not aid either party to an illegal agreement . . . ." *Lowenburg v. Klein*, 125 Miss. 284, 87 So. 653, 654 (1921). "This Court has long recognized the maxim, from the words of Lord Mansfield, in *Holman v. Johnson*, 1 Cowper. 341, decided in 1775, 'ex dolo malo non oritur actio,' which means that '[n]o Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.'" *Price v. Purdue Pharma Co.*, 920

23

So. 2d 479, 484 (Miss. 2006) (quoting *Morrissey v. Bologna*, 240 Miss. 284, 123 So. 2d 537, 545 (1960) (Gillespie, J., dissenting)). We have said that "[n]o principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim." *Lowenburg*, 87 So. at 654. "The object is to punish the active agent in the violation of a law by withholding from him the anticipated fruits of his illegal act, and thus, by deterring all persons from violating its mandates, to give sanctity to the law and security to the public." *Id.* at 655. During statewide prohibition, this Court applied this doctrine to affirm the dismissal of a suit on a fidelity bond issued to a liquor business because the business was illegal and against public policy, *Smith v. Maryland Cas. Co.*, 252 Miss. 81, 85, 172 So. 2d 574, 575 (1965), and to prohibit the use of courts to collect debts associated with the sale of intoxicating liquor, *J. & S. Goodman v. Swett*, 108 Miss. 224, 66 So. 535, 536 (1914). Our law likewise bars an action founded on a contract concerning the operation of an illegal pain management clinic.

¶55.    In addition to the rule that courts will not enforce an illegal contract, Dr. Yost's operation of an illegal pill mill means that he presented himself before the chancery court with unclean hands. The doctrine of unclean hands dictates that "[h]e who comes into equity must come with clean hands." *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss. 1970). The doctrine means that "no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful

inequity . . . ." ***O'Neill v. O'Neill***, 551 So. 2d 228, 233 (Miss.1989).

¶56. Dr. Okoloise raised the illegality of the contract's subject matter and the doctrine of unclean hands as defenses to Dr. Yost's lawsuit. Given the surfeit of evidence that Dr. Yost sought the aid of the chancery court to recover for losses incurred in the operation of an illegal pain management clinic, the chancery court should have applied those doctrines to bar any relief to Dr. Yost. Mississippi's judicial system should not function as an instrument for the resolution of disagreements between unethical persons operating pill mills in subversion of drug enforcement laws. Therefore, I believe that this case must be reversed and rendered, although for vastly different reasons than those articulated by the majority.

**KING, P.J., JOINS THIS OPINION.**